# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA,**

        Plaintiff,

        v.                               Case No. 05-CR-289

**SANTIAGO E. MERAZ, et. al.,**

        Defendants.

## RECOMMENDATION TO THE HONORABLE LYNN ADELMAN REGARDING THE DEFENDANTS' MOTIONS TO SUPPRESS

On November 22, 2005, the grand jury returned a single count indictment alleging that the defendants conspired to possess with intent to distribute five kilograms or more of cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A), and 846.

On July 20, 2006, Juan Curiel filed a motion to suppress and on July 26, 2006, Santiago Meraz did the same. Juan Curiel filed various other motions on July 22, July 27, and July 28. All these motions were untimely; however, the government did not object to the defendants' untimeliness. Additionally, neither defendant complied with Criminal Local Rule 12.3 or this court's pretrial order when they requested an evidentiary hearing. Nonetheless, having received no objection from the government, this court conducted an evidentiary hearing on November 16, 2006. A summary of the evidence adduced at this hearing is set forth below.

At the conclusion of this hearing, Juan Curiel withdrew all pretrial motions other than his motion to suppress. Thus, the defendants' motions to suppress are the only pretrial motions yet to be resolved. These motions are fully briefed and ready for resolution. A final pretrial conference is

scheduled January 10, 2007 and a jury trial is scheduled to commence on January 16, 2007 before the Honorable Lynn Adelman.

## EVIDENTIARY HEARING SUMMARY

The evidentiary hearing consisted entirely of the testimony of Trooper Benjamin Peech ("Trooper Peech") of the Wyoming State Patrol. On July 17, 2005, Trooper Peech was patrolling Interstate 80 near Pine Bluffs in the south-eastern corner of Wyoming. Shortly before 7:40 P.M. a Honda Accord drove past Trooper Peech as he was parked on the side of the interstate. The driver of this vehicle appeared to lock eyes with Trooper Peech and continued to watch Trooper Peech as he drove by. This vehicle then quickly exited the interstate without using a turn signal. Such action is a violation of Wyoming law. Trooper Peech followed the car as it pulled into the parking lot of a restaurant. The driver and the two passengers were already exiting the vehicle when Trooper Peech pulled up to the vehicle. To memorialize the encounter, nearly all subsequent relevant events were audio and video recorded by way of video recorder mounted on the dash of Trooper Peech's squad car. Tapes of these events were received into evidence as exhibits 1 and 2. Below is largely a summary of what is contained on these tapes.

Trooper Peech informs the driver that he was being stopped for his failure to use a turn signal and asks the driver for his license, registration, and proof of insurance. The driver apologizes for not using his signal and states that he does not have insurance and insurance is not required in Wisconsin. Trooper Peech takes issue with the driver whether Wisconsin requires liability insurance.

Trooper Peech identifies the driver as Santiago Meraz and asks him to sit in the squad car. Trooper Peech tells Meraz that he will give him a warning for his failure to use the turn signal and cite him for the failure to have insurance. Meraz asks Trooper Peech if he has been to Mexico. Trooper Peech says that he has a 20 peso bill in his squad car and Meraz's question was in reaction

to seeing this bill. Trooper Peech replies that he has been to Mexico many times. Trooper Peech asks Meraz whose car it is and is told that it is owned by the mother of the passenger, Juan Curiel. Trooper Peech then contacts his dispatch and is informed that Meraz's driver's license is suspended.

Trooper Peech then makes contact with Curiel, who states that the car belongs to his mother. Trooper Peech asks Meraz where he is coming from and the response is from California, specifically east L.A. At first Meraz says he was visiting his grandmother for the Fourth of July and then quickly corrects himself and says that he was visiting Curiel's grandmother. Meraz then explains that Curiel is his brother-in-law in that he is married to Curiel's sister.

Trooper Peech asks Meraz if he has children and Meraz says that he has a two-week-old daughter. Trooper Peech congratulates Meraz and asks if his wife is at home and whether this is the reason she did not come out with him. Meraz says that this is the reason. Trooper Peech then asks if Meraz has family in L.A. and Meraz says that he does not, but has family about eight hours away that he did not visit. During this time, dispatch informs Trooper Peech that Wisconsin requires liability insurance. Also during this time, dispatch is attempting to ascertain the reason for the suspension of Meraz's license. Meraz tells Trooper Peech that he took care of his suspension and produces paperwork dated in May to indicate that he paid various fines.

While Trooper Peech is waiting for information from dispatch, Meraz asks Trooper Peech if there is a virgin in the area, which he understands to be a question regarding a large statue of the Virgin Mary that is nearby. Trooper Peech provides Meraz with directions to the statue. Trooper Peech asks Meraz who they stayed with in L.A., and Meraz says that they stayed with Curiel's grandmother.

Just before 7:52 P.M., Trooper Peech asks Curiel if he can speak with him and asks why his mother does not have insurance on the car. He then tells Curiel that he will get the ticket for no

3

insurance. Trooper Peech then asks if the other passenger, Vanessa Ledezma, has a valid driver's license because Curiel holds only an identification card. Curiel tells Trooper Peech that Ledezma has a license.

Trooper Peech then asks Curiel where they are coming from and Curiel says that they were visiting his grandmother and says they were there for a week. Curiel then says that he drove his grandmother out to L.A. Trooper Peech then asks Ledezma if she has a valid driver's license and she provides Trooper Peech with her license. Trooper Peech returns to Meraz and asks who drove out to L.A. Meraz states that all three drove out to L.A. together.

Meraz says that he was pulled over in St. Louis on the trip out to L.A. and there was no problem with his driver's license at that time. Meraz says he drove out on Interstate 70 and Trooper Peech asks why they are not driving back the way they came. Meraz says he heard that Interstate 80 was shorter.

Trooper Peech gives Meraz a ticket for driving while his license was suspended and Meraz exits the squad car. Trooper Peech then calls Curiel over to the squad car and asks him to have a seat. He then asks why his license is revoked; information Peech had just learned from dispatch. Trooper Peech then says that he is going to give Curiel a ticket for no insurance. Trooper Peech then asks Curiel how long they were in L.A. and Curiel says they were out for the Fourth of July.

Curiel then says again that they took his grandmother out to L.A. At 8:03 P.M. Trooper Peech says that Ledezma and Meraz can go into the restaurant if they want. Curiel passes this information along to them and they enter the restaurant.

Just before 8:07 P.M., Trooper Peech completes writing the citation and asks Curiel if he has any questions. He then says, "You're good to go." Curiel gets out of the car but does not leave the vicinity of the squad car. About thirty-seconds later, Trooper Peech asks if it is alright if he asks Curiel some more questions. Trooper Peech begins by asking who drove out to L.A. Curiel

4

says that it was him, his cousin, his girlfriend, his grandmother, and his aunt. He then says that Meraz flew to L.A. last week to help Curiel drive back. Curiel also says that he is engaged to Ledezma and Trooper Peech offers his congratulations.

At 8:09, Trooper Peech asks Curiel if they have anything in the car that he should know about. He casually leans on the hood of the squad car and folds his arms. He asks about guns, large amounts of cash, drugs, marijuana, methamphetamine, cocaine, heroin, and Curiel says no to each of these. Trooper Peech then asks if it would be alright with Curiel if he searched the car to make sure none of these items were in the car. Curiel responds, "I don't care. It's up to you." Trooper Peech responds, "If that's ok with you that would be great." Curiel then says something that cannot be understood and Trooper Peech responds, "Great. Thanks." Trooper Peech returns to his squad car and collects his flashlight and gloves. Again, Curiel says something that cannot be understood and Trooper Peech asks "Is that O.K.?" Curiel seems to say something that cannot be understood and Trooper Peech says, apparently to himself, "He says yeah."

Trooper Peech goes to open the door and the vehicle's alarm chirps. Trooper Peech asks Curiel who has the keys and is told that Meraz has them. Curiel offers to go get them but Trooper Peech says he will. At this time Meraz comes out of the restaurant and without being asked, opens the car using the electronic opener and says, "It's open." Trooper Peech thanks Meraz and then asks, "Is it alright with you if I search around in there?" Meraz responds, "Yeah, go ahead."

Trooper Peech commences his search and is recorded commenting to himself about the overwhelming smell of air fresheners. Trooper Peech testified that he observed two hanging air fresheners in the back of the car as well as a powerful can-type air freshener. He described the smell as "obnoxious" and "powerful."

As Trooper Peech searches the trunk of the car, he notices a lot of new items such as expensive athletic shoes and says to himself, "Doper's shopping spree." Trooper Peech testified

5

that this comment referred to a phenomenon he recognized from his training and experience where persons who were hired to transport drugs often make substantial purchases during the trip, utilizing the proceeds of their labors. Trooper Peech removed various plastic bags and suitcases and placed them on the pavement outside the trunk. Trooper Peech undertook a thorough search of the vehicle, examining the interior of the vehicle, opening the hood, and laying on the ground to be able to examine the underside of the vehicle. He opens the suitcases he found in the trunk, makes a relatively cursory inspection, and then places a suitcase back in the trunk. Much of his search is concentrated upon the trunk and rear passenger compartment of the vehicle.

At 8:41, Trooper Peech asks a deputy sheriff who had previously arrived if he would request a canine unit to come to the scene. This deputy largely remains off camera but Trooper Peech testified that the deputy remained in his car until Trooper Peech collected his flashlight and gloves, a signal to the deputy that Trooper Peech was about to commence a search. At this point, the deputy exited his vehicle and kept watch to ensure Trooper Peech's safety as he searched.

At 8:42, while looking underneath the dash, Trooper Peech says "idiot" to himself, which he explains was voicing frustration with himself for concentrating his search upon the back area of the car where he saw the air fresheners rather than closely examining the entire car. Trooper Peech explained that at this time he noticed that the heating vents were obstructed with cardboard that was secured with hot glue. At 8:43, the deputy is seen informing Trooper Peech that the canine unit is on its way. Trooper Peech testified that the dog and its handler were approximately sixty miles away and there were no closer dogs.

Trooper Peech then returns to his vehicle and dispatch says that they need to talk to him by way of cell phone rather than radio. Trooper Peech calls dispatch and the cell phone call is recorded on the tape. Dispatch tells Trooper Peech that the manager of the restaurant called the

police to say that a female from the vehicle Trooper Peech was searching went into the bathroom and flushed the toilet and then came right back out after just a couple seconds.

Trooper Peech then contacts Ledezma and asks her what she flushed down the toilet. She says that she had to use the bathroom and denies having used the bathroom for just a few seconds. She also stated that she had to use the bathroom when Trooper Peech stopped them; however, she states that she used the bathroom only minutes ago.

At 8:48, Meraz is seen approaching Trooper Peech as he is searching under the front dash. He asks Trooper Peech if he can go use the restroom and Trooper Peech says, "Sure." Meraz then walks away towards the restaurant. All of this occurs without Trooper Peech stopping his search.

At 8:53, Trooper Peech asks Curiel if he had a non-factory stereo installed in the car. Off camera, Curiel responds that he did not. Trooper Peech then asks why the stereo would have been taken out. Curiel says that it is his mom's car and he knows nothing about it. Trooper Peech gets a screwdriver, returns to the car, and begins to unscrew the screws surrounding the car stereo. Trooper Peech testified that he observed a compartment that was secured with what he described as an electronic release mechanism ordinarily used for a trunk. He said he was able to open this latch by taking a loose wire and connecting it to the latch, causing the latch to open.

At 8:58, Trooper Peech tells the deputy to handcuff all three of the defendants. Trooper Peech says he will explain things to them once he figures out what is going on but says that they are committing "criminal activity." Ledezma begins to cry. Curiel is placed in the front seat of the squad and Ledezma is in the back seat. Ledezma continues to cry. Trooper Peech says again he will explain things in a minute but says that there are "serious problems." Curiel says that he does not understand what is going on and Trooper Peech says, "You might want to tell your girlfriend why." Trooper Peech then leaves Ledezma and Curiel alone in the squad car and they continue to talk, largely in Spanish. Although neither Curiel nor Ledezma can be seen, the audio of this

7

conversation is recorded on the squad car's video camera. The court was not provided with a translation of what the defendants said while in the squad car. However, at 9:10 Curiel says in English, "What's he looking for?" Ledezma responds, "I just want to go home." The tape ends shortly thereafter. Trooper Peech testified that the tape ran out. At 9:23, Trooper Peech replaced the tape and resumed recording. This tape was received as exhibit 2.

At 9:28, a deputy with a canine can be seen at the vehicle. Trooper Peech testified that the canine indicated that drugs could be found in the dash of the vehicle. Shortly after the canine can be seen on the tape, Trooper Peech returns to the car and provides both Curiel and Ledezma with their <u>Miranda</u> rights. An interrogation proceeds. This Mirandized interrogation is not subject to a motion to suppress.

Trooper Peech took various digital photos of the vehicle. These photos were received into evidence as exhibits 4a, 4b, and 4c. Each page consists of twelve photos and among the scenes depicted in these photos is a compartment behind the car's stereo. Blue and black plastic packages can be seen in this compartment. Various air fresheners can be seen in these photos as well as a package of toothpaste. Trooper Peech testified that in his experience persons trafficking drugs for long distances often carry personal hygiene items in the passenger compartment of their vehicles because traffickers do not want to stop while transporting drugs. Trooper Peech also noted that the car was exceptionally clean—cleaner than what would be expected for at least three people returning from a substantial trip. This exceptional cleanliness is also consistent with his knowledge of drug traffickers. Also in the backseat were a pillow and a blanket. Again, this was consistent with Trooper Peech's experience with drug traffickers. He knew that drug traffickers preferred not to stop and would rather alternate drivers where one person slept while the other drove. Trooper Peech testified that he observed all these items while conducting the initial traffic stop.

8

ANALYSIS

**1. Search**

Curiel argues that the evidence recovered from the vehicle should be suppressed because the search was unreasonable in that it was unreasonably thorough and that Trooper Peech misconstrued innocuous conduct to form a basis for his suspicion. Meraz argues the consent that Curiel and Meraz provided was not voluntary and that the search exceeded the scope of the consent.

In Schneckloth v. Bustamonte, the Supreme Court stated: "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." 412 U.S. 218, 227 (1973). This court considers a number of factors when determining whether consent to search was voluntary: "age, education, and intelligence of the defendant; advisement of his rights; how long he was detained prior to the consent; repeated requests for consent; physical coercion; and whether he was in custody." United States v. Kozinski, 16 F.3d 795, 810 (7th Cir.1994); see also Schneckloth, 412 U.S. at 226. A determination of voluntariness does not ride on "the presence or absence of a single controlling factor," but that the court must make a "careful scrutiny of all the surrounding circumstances." Schneckloth, 412 U.S. at 226.

It is clear that Trooper Peech had probable cause to stop the vehicle, based on the traffic violation. He did so and conducted a reasonable investigation, revealing that Meraz was driving with a suspended license and without insurance. Trooper Peech wrote these citations and ended the traffic stop.

Trooper Peech then initiated a subsequent encounter by asking Curiel if he could ask him some more questions. At this point, Trooper Peech acted without probable cause, but this standard is not required to justify this encounter. Given the contradictory information he received from Meraz and Curiel, as well as the number of air fresheners, the toothpaste in the glove compartment,

the pillow and blanket, and the uncharacteristically clean interior, based upon his training and experience, Trooper Peech had reason to be suspicious. Thus, he had a basis to conduct an investigatory stop in line with Terry v. Ohio, 392 U.S. 1, 30 (1968).

It is not clear whether the post ticket issuance interaction between Trooper Peech and Curiel rose even to the level of a Terry stop in that there was no indication that Curiel was not free to refuse. Rather, it appears this encounter between Peech and Curiel may have been entirely consensual. A police officer ordinarily is free to ask anyone he passes on the street if the person is willing to answer questions, and the person is free to refuse. Regardless of whether best characterized as a suspicionless encounter or a Terry stop, Trooper Peech's subsequent questioning of Curiel was entirely legitimate. It was during this questioning that Trooper Peech obtained consent to search the vehicle.

Carefully scrutinizing the totality of the attendant circumstances, this court concludes that both defendants voluntarily consented to the search. The only factors that cut in favor of the defendants are age and the fact that they were not advised of their rights before they provided consent. Although the defendants are comparatively young, they are nonetheless adults. As for the fact that they were not advised of their right to refuse consent, there is absolutely no requirement that the defendants be so advised. Nor is it required to advise the defendants of their Miranda rights given that they were not in custody.

The court received no evidence regarding the defendants' education or intelligence. All other factors indicate that the consent was voluntary. The defendants were detained for a relatively short period of time prior to providing consent. The defendants were detained only as long as was necessary for Trooper Peech to conduct the required investigation and write citations associated with the traffic stop. Thereafter, both defendants were told that they were free to go prior to giving their consent to search. There is a complete lack of physical coercion and the defendants were not

in custody. In fact, the defendants were no longer even detained, although, as explained above, Trooper Peech had a basis to detain the defendants while he investigated his suspicions. Finally, although the request for consent was made to both Meraz and Curiel, such repetition supports the conclusion that consent was freely given. In other words, Trooper Peech did not ask repeatedly in an effort to overcome earlier refusals, but rather went above and beyond what is required and asked both the person to whom the owner apparently loaned the car and the person who had been driving, whether it was alright for him to search. These are not at all the sort of repeated requests that would give a court pause as to whether or not consent was freely given.

Overall, the videotape of the Trooper Peech's encounter with the defendants indicates that Trooper Peech was exceptionally accommodating, friendly, non-threatening, and professional; there is simply no evidence to indicate that the defendants did not voluntarily consent.

As for the scope of the consent, a court evaluates the scope of consent by determining what a reasonable person would have understood, based upon the exchange with the police officer. Florida v. Jimeno, 500 U.S. 248 (1991); United States v. Lemmons, 282 F.3d 920 (7th Cir. 2002). "Factors the court must consider include, but are not limited to, the defendant's behavior during the search, the purpose of requesting consent to search, the location of the search, and any show of force." United States v. Osuorji, 32 F.3d 1186, 1190 (7th Cir. 1994).

There is absolutely no evidence to indicate that either defendant somehow limited his consent. Trooper Peech asked to search the car and he did just that. The search was no doubt thorough.

Furthermore, at some point during the consent search, Trooper Peech's suspicion was elevated to probable cause, creating another justification to search the vehicle. Assuming that it was unreasonable and beyond the scope of the consent to dismantle the dash of the vehicle to expose the trap compartment, it certainly was not unreasonable for Trooper Peech to examine the

11

vehicle's vents and radio. It was then he observed the non-factory stereo and markings on the face plate screws. These facts, combined with various other facts such as the excessive quantity of air fresheners, the new and expensive items found in the trunk, the remarkably clean interior, the toothpaste in the passenger compartment, the blanket and pillow in back seat, the fact that Meraz left his wife at home and went to California with his brother-in-law just days after his wife gave birth to their first child, and most notably, the hugely divergent stories between Meraz and Curiel regarding who drove from Wisconsin to California, all added up to probable cause to believe that the defendants were transporting contraband secreted within the dash of the vehicle. Thus, regardless of whether the search of the dash was beyond the scope of the consent, it is clear that Trooper Peech had probable cause to dismantle the dash and thus the search was consistent with the Fourth Amendment. See, e.g., United States v. Ross, 456 U.S. 798 (1982). Therefore, this court shall recommend that the defendants' motions to suppress be denied.

**2. Statements**

Curiel also argues that statements he made to Ledezma while handcuffed in the back of Trooper Peech's squad car should be suppressed on the basis that Curiel was not advised of his Miranda rights and he was not informed that his statements were being recorded. Curiel's arguments for suppression are cursory and consist of a single paragraph in his post-hearing brief. Nonetheless, this court shall make its best effort to fully evaluate Curiel's arguments for suppression.

It appears that Curiel attempts to raise two separate bases for suppression. First, he argues that the statements should be suppressed because Curiel had a reasonable expectation of privacy in that he did not expect that his conversation would be recorded. As this court interprets Curiel's claim, it is possible that he is seeking relief under either the Fourth Amendment or Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522. Curiel references

12

neither in his brief. Thus, this court shall address both possibilities. The analysis for both possibilities turns largely upon the question of whether a person would have a reasonable expectation of privacy when seated in a squad car. See United States v. McKinnon, 985 F.2d 525, 527 (11th Cir. 1993).

This court was able to locate only two cases from district courts within the Seventh Circuit which addressed this issue. In United States v. Sallee, No. 91 CR 200006-19, 1991 U.S. Dist. LEXIS 20553 (N.D. Ill. Oct. 24, 1991), the defendant was stopped for a muffler violation, and the defendant and two passengers were given the option of standing in the rain or waiting in the sheriff's car. All three sat in the back of sheriff's car where a video camera was mounted on the front dash and pointed forward. This camera recorded the audio of the group's conversation. Although the court at that time was unable to locate any federal case having dealt with the issue, the court turned to numerous state court cases and held that a person did not have a reasonable expectation of privacy while sitting in the back seat of a squad car and thus the recording did not violate Title III.

Second, in a 2005 case from the Southern District of Indiana, the court orally denied a motion seeking to suppress statements of the defendants that were recorded as they were being transported in the back of a police wagon on the basis that the defendants lacked a reasonable expectation of privacy. United States v. Ingram, No. IP 04-201-CR-1 H/F, 2005 U.S. Dist. LEXIS 5843, at *3 n.1 (S.D. Ind. March 25, 2005) (citing United States v. Turner, 209 F.3d 1198 (10th Cir. 2000); United States v. Clark, 22 F.3d 799 (8th Cir. 1994); United States v. McKinnon, 985 F.2d 525 (11th Cir. 1993)).

This court has been unable to locate a decision from any jurisdiction in which a court held that a person has a reasonable expectation of privacy in a squad car. The only reference to such a decision that this court was able to locate is United States v. Clark, 22 F.3d 799 (8th Cir. 1994), in

which the Circuit Court reversed the District Court's order to suppress. All other Circuit and District Court decisions this court was able to locate held that there is no reasonable expectation of privacy in a squad car. See, e.g., United States v. Turner, 209 F.3d 1198 (10th Cir. 2000); United States v. Clark, 22 F.3d 799 (8th Cir. 1994); United States v. McKinnon, 985 F.2d 525 (11th Cir. 1993); United States v. Jones, No. CR-1-06-073, 2006 U.S. Dist. LEXIS 63578 (S.D. Ohio September 6, 2006); United States v. Fabian, No. 2:04-CR-71-01, 2005 U.S. Dist. LEXIS 32997 D. Vt.. Aug. 23, 2005); United States v. Martinez Saenz, No. 99-20276 M1/Bre, 2000 U.S. Dist. LEXIS 21862 (W.D. Tenn. March 22, 2000); United States v. Harris, No. 3:93CR758, 1994 U.S. Dist. LEXIS 18479 (N.D. Ohio August 30, 1994).

This court finds persuasive the reasoning set forth in these decisions, particularly in Clark, and believes that a person has no reasonable expectation of privacy in a squad car.

> A marked police car is owned and operated by the state for the express purpose of ferreting out crime. It is essentially the trooper's office, and is frequently used as a temporary jail for housing and transporting arrestees and suspects. The general public has no reason to frequent the back seat of a patrol car, or to believe that it is a sanctuary for private discussions. A police car is not the kind of public place, like a phone booth (e.g., Katz v. United States, 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967)), where a person should be able to reasonably expect that his conversation will not be monitored. In other words, allowing police to record statements made by individuals seated inside a patrol car does not intrude upon privacy and freedom to such an extent that it could be regarded as inconsistent with the aims of a free and open society.

22 F.3d at 801-02. Thus, recording Curiel's statements did not violate Title III or the Fourth Amendment.

As for Curiel's second possible argument, that his statements were obtained in violation of his Miranda rights, there is no doubt that Curiel was in custody. But he was not subjected to custodial interrogation, nor did he make any statements in response to interrogation during this time. Therefore, there are no statements to suppress. The statements Curiel seeks to suppress were

14

made independent of Trooper Peech's actions and thus, this court shall recommend that Curiel's motion to suppress be denied.

By way of further analysis, when a suspect is in custody and subjected to interrogation, law enforcement must inform that suspect of his right to remain silent, his right to an attorney, and the fact that any statement he makes may be used as evidence against him. United States v. Dickerson, 520 U.S. 428 (2000); Miranda v. Arizona, 384 U.S. 436 (1966); United States v. James, 113 F.3d 721, 726 (7th Cir. 1997). At the time Trooper Peech made his comments to Curiel, the defendant was in custody; he was handcuffed and about to be placed into a squad car. Thus, the issue becomes whether Curiel was subject to interrogation.

Trooper Peech uttered only a single comment that could possibly be regarded as constituting interrogation. After informing Curiel and Ledezma that there are "serious problems" and he will explain it to them later, Trooper Peech responds to Curiel's expression that he does not understand with what is going on by saying, "You might want to tell your girlfriend why." Thus, the question is whether this statement by Peech constituted interrogation.

The Court in Miranda defined interrogation as "questioning initiated by law enforcement officers." Miranda v. Arizona, 384 U.S. 436, 444 (1966). The Court later expanded on this definition and said "the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980); see also Pennsylvania. v. Muniz, 496 U.S. 582, 601 (1990) (quoting Harryman v. Estelle, 616 F.2d 870, 874 (5th Cir. 1980)) (defining interrogation as including "both express questioning, and also words or actions that, given the officer's knowledge of any special susceptibilities of the suspect, the officer knows or reasonably should know are likely to 'have . . . the force of a question on the accused.'").

15

Applying the Innis and Muniz definitions to the facts of this case, this court believes that Trooper Peech's statement, "You might want to tell your girlfriend why," is a statement "the police should know are reasonably likely to elicit an incriminating response from the suspect." Innis, 446 U.S. at 301. In response, had Curiel explained to Ledezma why they were being arrested, his explanation would have likely been incriminating. Therefore, because Curiel was in custody and not provided his Miranda warnings, any incriminating statements made in response to Trooper Peech's prodding statement should be suppressed. However, Curiel did not respond to Trooper Peech's statement, and therefore there are no incriminating statements to suppress. Curiel remained silent and was placed into a squad car with Ledezma. They subsequently began to converse, but no evidence was introduced to indicate that it was Trooper Peech's statement, in any way, that motivated Curiel to speak. Based on the record, this court would have to speculate as to what motivated Curiel to talk with Ledezma.

When there is an earlier improper interrogation, subsequent statements need not be suppressed if there is a sufficient "break in the stream of events" so that the taint of the improper interrogation is sufficiently removed and the subsequent statement was voluntary. See Watson v. Detella, 122 F.3d 450, 454 (7th Cir. 1997). Factors a court should consider in determining whether there has been a sufficient break so as to remove the taint of the improper police conduct upon the subsequent statements include the length of time between the two events, whether there was a change of location, and whether there was a change of inquisitors. Watson, 122 F.3d at 454-55 (citing United States v. Marenghi, 109 F.3d 28, 33-34 (1st Cir. 1997); Holland v. McGinnis, 963 F.2d 1044, 1050-51 (7th Cir. 1992); Wilson v. O'Leary, 895 F.2d 378, 384-85 (7th Cir. 1990)). None of these factors is dispositive; rather, all factors must be considered in the aggregate. Watson, 122 F.3d at 454-55.

In evaluating these factors, this court concludes that there was a sufficient break in events so as to remove the arguable taint of Trooper Peech's improper interrogation. It is not clear what amount of time elapsed between Trooper Peech's statements and Curiel's incriminating statements. Because this court was not provided with translations of what was said between Curiel and Ledezma, it is not clear at what point the conversation became incriminating, if at all. For the sake of argument, Curiel and Ledezma began to talk immediately upon being left alone in the car. Even assuming that Curiel's statements were immediately incriminating, there was an obvious and significant change of venue. Trooper Peech made his comment while all were outside the squad car; Curiel's statements were made inside the squad car. Although the distance is a matter of a few feet, these locations were substantially different in character. No longer were Curiel and Ledezma outside and among the police officers who had arrived at the scene but were alone in the relative quiet, comfort, and security of a squad car. Any coercive influence that may exist when a person is in custody and in the presence of the police is substantially dissipated when the police are removed from the situation.

Finally, and most significant is the third factor. In the present case, the inquisitor was not replaced with another but rather was entirely removed. Under the circumstances of this case, the fact that Trooper Peech was not present when Curiel made his statements is a substantial factor indicating that Curiel spoke voluntarily and un-influenced by the taint of Trooper Peech's improper interrogation. The evidence indicates that Curiel thought he was speaking alone to his girlfriend and did so free from Trooper Peech's influence. Given that Curiel was not speaking to a government agent, there is little concern that he would feel coerced. See Illinois v. Perkins, 496 U.S. 292, 300 (1990).

There are additional factors that this court considers significant to the conclusion that the taint of the un-Mirandized interrogation dissipated quickly. First is Trooper Peech's demeanor

17

throughout his interactions with the defendants and when he made the statement at issue. As explained above, the videotape recorded Trooper Peech behaving in an exceptionally accommodating, friendly, non-threatening, and professional manner. The tape enables this court to actually hear precisely the tone and manner in which Trooper Peech made the statements. Again, as he was throughout the encounter, Trooper Peech was cordial and relatively nonchalant when he said, "You might want to tell your girlfriend why." The taint of a relatively benign comment from a police officer who has been nothing but cordial and respectful will dissipate quicker than if the identical comment had come from a police officer who had been hostile and confrontational throughout the entire encounter.

Second, and related to the first, is the context of the comment. Trooper Peech had certainly gained some degree of rapport with the defendants. Ledezma was obviously upset and Curiel was calmly seeking an explanation for their arrest. Trooper Peech had previously informed the defendants that he would explain things to them soon but nonetheless Curiel persisted, calmly and respectfully, seeking an explanation. Only at this point, perhaps in response to Ledezma's obvious distress, did Trooper Peech encourage Curiel to tell Ledezma the reason for their arrest. Based upon the surrounding context of his statement, Trooper Peech was telling the defendants that he was not going to talk to them at that time and thus if Ledezma needed an explanation for the arrest, it was up to Curiel to inform Ledezma. Given this context, there was a minimal, if any, threat of coercion and certainly no threat of any coercive pressure imposed by law enforcement persisting more than a few seconds.

Third, and finally, the court finds significant the actual words. At issue in the present case is a single sentence consisting of eight words. The words are not threatening but instead are rather benign. They contain no hint of coercion. They are a sort of passing comment that a person may hear and ordinarily quickly dismiss.

In light of all these factors, this court believes that there was a sufficient break between Trooper Peech's comment and Curiel's statement, and therefore this court shall recommend that Curiel's motion to suppress be denied.

**IT IS THEREFORE RECOMMENDED** that the defendants' motions to suppress be **denied**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B)-(C), Federal Rule of Criminal Procedure 59 (b)(2), and General Local Rule 72.3 (E.D. Wis.); whereby written objections to any recommendation herein or part thereof may be filed within ten days of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to object in accordance with the rules cited herein waives your right to review.

Dated at Milwaukee, Wisconsin this 15th day of December, 2006.

s/AARON E. GOODSTEIN
U.S. Magistrate Judge