# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
          **Plaintiff,**

          **v.**                                              **Case No. 05-CR-289**

**SANTIAGO MERAZ and JUAN CURIEL**
          **Defendants.**

## DECISION AND ORDER

Defendants Santiago Meraz and Juan Curiel are charged with possession with intent to distribute five kilograms or more of cocaine. Both defendants moved to suppress contraband seized from their vehicle, and Curiel moved to suppress statements he made while detained in the arresting trooper's squad car. I referred the motions to a magistrate judge, who held a hearing and recommended that they be denied. Curiel objects, requiring me to conduct a de novo review.[1] Fed. R. Crim. P. 59(b). For the reasons that follow, I adopt the recommendation in part and deny the motion to suppress physical evidence. I will order that further evidence be presented on the motion to suppress statements.

### I. FACTS AND BACKGROUND[2]

On July 17, 2005, at about 7:40 p.m., Wyoming State Trooper Benjamin Peech, while

---

[1]Meraz has not filed a timely objection. Therefore, he has waived his right to review and appeal, Fed. R. Crim. P. 59(b)(2); United States v. Hall, 462 F.3d 684, 689 (7th Cir. 2006), and I deny his motion.

[2]Curiel does not specifically object to the magistrate's summary of the evidence, which was based primarily on a video tape of the encounter made by the arresting trooper. (Govt.'s Ex. 1 & 2.) I have reviewed the tape, as well, in making my decision. To the extent that Curiel disputes the magistrate's characterization of some of the evidence, I address his contentions below.

on patrol on Interstate 80, observed a Honda Accord exit the highway without signaling, a violation of Wyoming law. Peech followed the car and pulled behind it in the parking lot of a restaurant, as the driver and two passengers were exiting. Peech advised the driver, later identified as Meraz, why he was stopping him and requested Meraz's driver's license, registration and proof of insurance. Meraz told Peech that liability insurance is not required in Wisconsin, which Peech disputed. Peech asked Meraz to have a seat in his squad car and indicated that he would issue Meraz a warning for failing to signal and cite him for failure to have insurance. Peech asked Meraz whose car he was driving, and Meraz stated that it belonged to the mother of his passenger, Curiel. Peech contacted dispatch and learned that Meraz's driver's license was suspended.

Peech then made contact with Curiel, who stated that the car belonged to his mother. Peech asked Curiel for ID, and Curiel produced an identification card.[3] Peech returned to Meraz and asked where he was coming from; Meraz stated East L.A. Meraz first stated that he was visiting his grandmother for the Fourth of July, then said that he was visiting Curiel's grandmother. Following some additional conversation, Peech approached Curiel and asked why his mother did not have insurance on the car. He then told Curiel that he would issue him a ticket for no insurance because it would be unfair to give it to Meraz. Peech also asked if the other passenger, identified as Vanessa Ledezma,[4] had a license, and Curiel stated that she did. Peech asked Curiel where they were coming from, and Curiel stated that they were visiting his grandmother. Curiel further stated that he drove his grandmother out to L.A. Peech told

---

[3]Curiel apparently had no driver's license.

[4]Ledezma has been charged as a co-defendant in this case.

2

Ledezma that she would have to drive when the three left.

Peech then returned to Meraz and asked him who drove out to L.A., and Meraz affirmed that the three drove out together. Peech ran Ledezma's license, and she came back valid. Peech gave Meraz a ticket for driving while his license was suspended, and Meraz exited the squad car. Peech then called Curiel over to the squad, asked why his license was suspended and indicated that he would issue him a ticket for no insurance. At 8:03 p.m., Peech stated that Ledezma and Meraz could go into the restaurant to get something to eat. At 8:06 p.m., Peech completed writing the tickets and told Curiel he was "good to go." Curiel exited the squad car but did not immediately leave the area. A few seconds later, Peech asked Curiel if he could ask him some more questions. Curiel said, "yeah." Peech asked who drove out to L.A., and Curiel stated that it was him, his girlfriend (Ledezma), his cousin, his grandmother and his aunt. He stated that Meraz flew out to L.A. to help him drive back. At 8:09 p.m., Peech asked Curiel if they had anything in the car that he should know about, such as guns, large amounts of cash or drugs. Curiel said no to each. Peech then asked if he could search the car to make sure they had no guns, drugs or large amounts of cash, and Curiel said, "I don't care. It's up to you." Peech responded, "If that's OK with you that would be great." Curiel's response was inaudible on the tape, and Peech responded, "Great. Thanks." Peech then said, apparently to himself, "He says yeah."

Peech tried to open the car door and the alarm chirped. Peech asked who had the keys. Meraz then exited the restaurant, unlocked the doors with an electronic opener and stated, "It's open." Peech then asked Meraz if he could search the car, and Meraz stated, "go ahead." Peech started to search at 8:11 p.m. and commented to himself on the strong smell of air fresheners in the car. He then proceeded to search the interior, the trunk and the bags within

3

it, under the hood and under the car.

At about 8:41 p.m., Peech asked a deputy sheriff who had arrived on the scene to request a K-9 unit. At 8:42 p.m., Peech noticed some cardboard secured with hot glue in the front dash. At 8:43 p.m., Peech was advised by dispatch that the manager of the restaurant called police and advised that Ledezma had gone into the bathroom, flushed the toilet and came back out within a few seconds. Peech approached Ledezma and asked what she had flushed down the toilet, and she stated that she had gone to the bathroom. Peech said okay and continued the search.

At 8:48 p.m., as Peech continued his search under the front dash, Meraz approached and asked to use the bathroom. Peech said "sure." At 8:54 p.m., Peech asked Curiel if he had a non-factory stereo installed in the car. Curiel said he did not know. Peech got a screwdriver, removed the screws around the stereo and discovered a compartment. Peech opened the compartment and discovered suspected bricks of cocaine. At 8:58 p.m., Peech directed that Meraz, Curiel and Ledezma be cuffed, stating that they were engaged in "criminal activity." Peech decided to place Curiel and Ledezma in his car. Ledezma began to cry, and Curiel stated that he did not understand what was going on. Peech stated, "You might want to tell your girlfriend why," closed the squad door and left. Ledezma and Curiel then conversed, mostly in Spanish, which was taped by the squad's video recorder.[5] At about 9:10 p.m., Curiel said, in English, "What's he looking for?" Ledezma said, "I just want to go home." At 9:28 p.m., shortly after the K-9 arrived, Peech provided defendants with their Miranda rights and

---

[5]Curiel seeks suppression of these statements, which were not interpreted at the hearing before the magistrate judge.

4

questioned them.[6]

## II. DISCUSSION

Curiel argues that the search of his vehicle was unreasonable and that his recorded statements made in the back of Peech's squad car, prior to the administration of Miranda warnings, should be suppressed.

**A.    Search of Car**

Peech was authorized to stop defendants based on the commission of a traffic violation, i.e. failing to signal. See Whren v. United States, 517 U.S. 806, 813 (1996); United States v. Cashman, 216 F.3d 582, 586 (7th Cir. 2000). Any ulterior motive Peech may have had for making the stop, such as suspicion of drug transportation, is irrelevant to the legality of the stop, see United States v. Hernandez-Rivas, 348 F.3d 595, 599 (7th Cir. 2003), which Curiel does not, in any event, contest.

Further, based on probable cause that a traffic violation had been committed, Peech was entitled to detain defendants for a reasonable period of time to complete the steps necessary to the issuance of traffic tickets. See Illinois v. Caballes, 543 U.S. 405, 407 (2005); see also United States v. Childs, 277 F.3d 947, 953-54 (7th Cir. 2002). He was also entitled to have the three occupants get out of the car. Maryland v. Wilson, 519 U.S. 408, 410 (1997) (citing Pennsylvania v. Mimms, 434 U.S. 106 (1977)). Peech took a little more than twenty minutes to check Meraz, Curiel and Ledezma's status and write out tickets, a reasonable period of time under the circumstances.

Shortly after Peech finished writing the tickets and told Curiel that he was "good to go,"

---

[6]Curiel does not seek suppression of his post-Miranda statements. Nor does he challenge the basis for his arrest.

5

Peech asked Curiel if he could ask him some more questions. Curiel agreed. Peech then asked for permission to search the car, which Curiel (and later Meraz) provided. While this prolonged the encounter, I agree with the magistrate judge that it was not unreasonable. Police may approach a citizen at liberty and ask questions or permission to search based on no quantum of suspicion, provided the officer does not induce cooperation by coercive means. See United States v. Drayton, 536 U.S. 194, 200-01 (2002). Defendants were not, at this time, in custody. The encounter occurred in a public place, Peech told Curiel that he could go,[7] Curiel consented to speak with Peech after Peech finished writing the tickets, Peech did not move Curiel to another area to continue the questioning, and Peech engaged in no threatening or coercive tactics to obtain Curiel's cooperation. See United States v. Yusuff, 96 F.3d 982, 985-86 (7th Cir. 1996) (listing factors relevant to determination of custody). Rather, the record of the encounter demonstrates that Peech was cordial and non-threatening.[8]

The next question is whether defendants validly consented to the search of the car. Generally, police may not search an automobile without a warrant or probable cause to believe that the car contains contraband. See United States v. Hines, 449 F.3d 808, 814 (7th Cir. 2006). However, the police may conduct a search without a warrant if consent is obtained.

---

[7]Peech had by this time allowed Meraz and Ledezma to go into the restaurant.

[8]In his objections, Curiel notes that by this point Peech had decided that defendants would not be free to leave. However, the determination of custody depends on the objective circumstances, not on the subjective views harbored by the officer. United States v. James, 113 F.3d 721, 726 (7th Cir. 1997). Even if Peech had decided that he was not going to allow defendants to leave without searching their car, he did not express that determination. See Berkemer v. McCarty, 468 U.S. 420, 442 (1984) ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.").

6

See United States v. Dorsey, 27 F.3d 285, 290 (7th Cir. 1994).  A voluntary consent "lifts" the warrant requirement.  United States v. Stribling, 94 F.3d 321, 324 (7th Cir. 1996).

The government bears the burden of proving by a preponderance of the evidence that consent was voluntarily given .  United States v. Basinski, 226 F.3d 829, 833-34 (7th Cir. 2000).  The court makes this determination by considering the totality of the circumstances.  Schneckloth v. Bustamonte,  412 U.S. 218, 227 (1973); Stribling, 94 F.3d at 324.  Relevant factors include (1) the defendant's age, intelligence and education; (2) whether he was advised of his constitutional rights; (3) how long he was detained before he gave his consent; (4) whether his consent was immediate or was prompted by repeated requests by the authorities; (5) whether any physical coercion was used; and (6) whether the individual was in police custody when he gave his consent.  United States v. Raibley, 243 F.3d 1069, 1075-76 (7th Cir. 2001).  The determination does not rest on the presence or absence of any one factor; rather, the court must consider all of the circumstances.  Schneckloth, 412 U.S. at 226.

I agree with the magistrate judge that defendants voluntarily consented to the search in the present case.  Defendants were not in custody and had previously been detained for only a short time while Peech wrote tickets.  Further, Peech did not badger defendants into consenting or use any physical coercion.  Rather, the evidence shows that Peech was cordial and had advised Curiel that he was "good to go" prior to requesting consent to search.  Finally, the record contains no evidence that defendants were, for any reason, particularly vulnerable to police coercion.  They readily gave consent when asked.

The last question is whether Peech exceeded the scope of consent with his thorough search of the car.  The scope of consent is defined by gauging, under the totality of the circumstances, what a reasonable person would have understood it to be based on the

exchange with the officer. United States v. Lemmons, 282 F.3d 920, 924 (7th Cir. 2002) (citing Florida v. Jimeno, 500 U.S. 248, 251 (1991)). Typically, the scope will be defined by the express object of the search, i.e. what the officers were looking to find. Jimeno, 500 U.S. at 251. Thus, officers may generally search the entire area in which the object might be found, including closed containers, Foreman v. Richmond Police Dept., 104 F.3d 950, 959 (7th Cir. 1997) (collecting cases), and engage in non-destructive dismantling to obtain access, United States v. Torres, 32 F.3d 225, 232 (7th Cir. 1994) (collecting cases). This is particularly true where the defendant gives unqualified consent. See United States v. Baker, 78 F.3d 1241, 1245 (7th Cir. 1996). Finally, the burden to limit the scope of the consent is on the defendant, Stribling. 94 F.2d at 324, and the court may construe the defendant's failure to object to a component of the search as consent to it, see United States v. Maldonado, 38 F.3d 936, 940 (7th Cir. 1994).

Based on this standard, I find that Peech did not exceed the scope of Curiel's consent. First, it was plain from his discussion with Curiel that Peech was primarily looking for drugs. Thus, he was entitled to search all areas of the car where controlled substances might be found, including the containers in the trunk and the secret compartment where the cocaine was eventually located. Second, neither Curiel nor Meraz placed any limits on the scope of the search, either at the outset or when Peech obtained a screwdriver and focused on the area behind the stereo. The Seventh Circuit has specifically upheld the removal of screws securing compartments or containers that might contain drugs. Torres, 32 F.3d at 232. Finally, although the search continued for about forty-seven minutes before defendants were arrested, its length also did not exceed the scope of the consent, particularly given the fact that neither Curiel nor Meraz protested. See United States v. Siwek, 453 F.3d 1079, 1086 (8th Cir. 2006) (finding that

8

forty-five minute search did not exceed scope of consent, where the defendant made no effort to withdraw or limit the scope and did not protest in any manner the continuation of the search). In sum, Peech did not exceed the scope of consent when he located the cocaine.[9]

Therefore, for these reasons and those stated by the magistrate judge, I deny defendants' motions to suppress physical evidence.[10]

## B.   Curiel's Statements

Curiel also argues that his statements to Ledezma while seated and cuffed in Peech's squad car (made prior to the provision of Miranda warnings) should be suppressed. To protect an individual's right against self-incrimination, a suspect must be advised of certain rights prior to being subjected to custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 444 (1966).

---

[9]The magistrate judge also concluded that Peech had reasonable suspicion to continue the encounter after he finished writing tickets based on the divergent stories told by Curiel and Meraz about their trip. He further found that Peech developed probable cause to search the car based on the suspicious circumstances, including defendants' dissembling and the condition of the car. In his objections, Curiel disputes the significance of the air fresheners, personal hygiene items and new sneakers Peech found in the car. Because I find that the search was valid pursuant to defendants' consent, I need not address these contentions.

[10]This case is quite similar to United States v. Ramstad, 308 F.3d 1139 (10th Cir. 2002). There, a state trooper stopped the defendant for a traffic violation. After completing a citation and stating that they were finished, the trooper asked the defendant if he could ask him a few more questions; the defendant agreed. The trooper asked the defendant if he was hauling anything illegal, such as drugs, guns or large amounts of money, which the defendant denied. The trooper then asked if he could take "a quick look around" defendant's RV. The defendant agreed, so long as the trooper did not "tear anything up." Inside the vehicle, the trooper noticed discrepancies in the wall near the bedroom area, including a recessed area, recent scrapes and scratches on the wall, and fresh caulking, screws and trim. He also noted that the speaker grill covers did not cover speakers, but just covered a small hole with a wire. The trooper unscrewed and removed the speaker covers, then called for a K-9 narcotics dog. The dog alerted at the rear wall, near the same area where the trooper had noticed fresh scratches and marks. The trooper then discovered marijuana behind the panel. Id. at 1141-42. The defendant challenged the search, but the court denied the motion, finding that the stop was lawful, the defendant's consent was voluntary, and the search, although quite thorough, did not exceed the scope of the consent. Id. at 1146-47.

9

To implicate Miranda, the suspect must be both "in custody" and subject to "interrogation." United States v. Yusuff, 96 F.3d 982, 987 (7th Cir. 1996). In the present case, it is undisputed that Curiel was in custody while cuffed and seated in Peech's squad car. The issue is whether he made statements in response to interrogation by Peech.

The Supreme Court defines interrogation as "either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). Thus, for purposes of Miranda, interrogation includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301. The court considers "whether a reasonable objective observer would have believed that the [statements claimed] to have been unlawful interrogation were in fact 'reasonably likely to elicit' an incriminating response." United States v. Westbrook, 125 F.3d 996, 1002 (7th Cir. 1997) (quoting Enoch v. Gramley, 70 F.3d 1490, 1499 (7th Cir. 1995)). Though the inquiry is objective, "the proper focus is 'primarily upon the perceptions of the suspect, rather than the intent of the police.'" Whitehead v. Cowan, 263 F.3d 708, 718 (7th Cir. 2001) (quoting Innis, 446 U.S. at 301). Volunteered statements, such as statements not given in response to any question, are not subject to Miranda. United States v. Abdulla, 294 F.3d 830, 834 (7th Cir. 2002).

The magistrate judge concluded that Peech engaged in interrogation when he told Curiel, "You might want to tell your girlfriend why." However, he found that Curiel did not respond to Peech's statement but rather remained silent until Peech left. Curiel then conversed with Ledezma inside the squad outside Peech's presence, and their statements

10

were taped by the squad's recording equipment.[11]

The statements at issue were made in Spanish, and the government has not provided a transcription in English. In order to determine whether the statements were made in response to interrogation by Peech, I find that it would be helpful to review the actual contents of the statements. See United States v. Peterson, 414 F.3d 825, 828 (7th Cir.), cert. denied, 126 S. Ct. 592 (2005) (finding no Miranda violation where the defendant did not respond to the officer's pre-warning interrogation). Therefore, I will order the government to provide a transcription.[12]

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that defendants' motions to suppress physical evidence (R. 36, 43) are **DENIED**.

**IT IS FURTHER ORDERED** that the government to provide a transcription of Curiel's statements on or before **February 5, 2007**. The parties may submit arguments based on the transcription on or before **February 12, 2007.**

Dated at Milwaukee, Wisconsin this 26th day of January, 2007.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

---

[11]In his objections, Curiel concedes that he had no reasonable expectation of privacy and thus his rights were not violated by the recording of his statements in the squad car. His sole contention is that his statements were obtained in violation of his Miranda rights.

[12]I previously ordered the government to provide this information in my January 9, 2007 Order (R. 79), but the government apparently overlooked that portion of the Order.

11